## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GEORGE ROBERSON** | ) | **Case No. 13-11103-BFK** |
| | ) | **Chapter 7** |
| Debtor | ) | |
| | ) | |
| **SANDS H. FIGUERS, SUCCESSOR TRUSTEE** | ) | |
| **OF THE HORACE H. FIGUERS** | ) | |
| **REVOLCABLE TRUST** | ) | |
| **Plaintiff** | ) | |
| **vs.** | ) | **Adversary Proc. No. 13-01161** |
| | ) | |
| **GEORGE ROBERSON** | ) | |
| **Defendant** | ) | |

### MEMORANDUM OPINION INCORPORATING
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a trial on the merits on April 7 and 8, 2014. For the reasons stated below, the Court finds that some of the debts owed by the Defendant are non-dischargeable pursuant to Section 523(a)(4) of the Bankruptcy Code. The Court finds certain other obligations to be dischargeable.[1]

### Findings of Fact

Having heard the evidence, the Court makes the following findings of fact:

*A. Mr. Roberson's Appointment as Successor Trustee.*

1.       George A. Roberson is an accountant. He has practiced as a Certified Public Accountant (CPA). He has been a CPA since 1974. He was the sole owner of George Roberson

---

[1] At the close of the Plaintiff's evidence, the Court granted the Defendant's Motion for judgment on partial findings pursuant to Bankruptcy Rule 7052 (incorporating Fed. R. Civ. P. 52(c)), and dismissed Count II of the Complaint because the Plaintiff failed to prove any misrepresentations on which the Plaintiff (or, at that time, the Trust beneficiaries) justifiably relied to his or their detriment. In the Court's view, the case was purely one involving Section 523(a)(4) (defalcation while acting in a fiduciary capacity).

& Associates, which he started in the 1970's. He maintained his office in Leesburg, Virginia.
The firm had an average of five employees at any given time, including Mr. Roberson. He is now
retired from the practice of accounting.

2.       In 2008, Neal Donahue bought Mr. Roberson's accounting practice. Owing to Mr.
Donahue's failure to pay employee withholdings at a time when Mr. Roberson still owned the
practice, Mr. Roberson was prohibited by the IRS from signing tax returns. This affected Mr.
Roberson's ability to sign tax returns from 2009 forward.

3.       Mr. Roberson took the practice back from Mr. Donahue, and later sold the
practice to Jeffrey Bolyard, effective March 2, 2012. Mr. Roberson turned the computers over to
Mr. Bolyard as a part of the purchase, and he put the records that Mr. Bolyard didn't want into a
storage facility in Winchester, Virginia.

4.       Horace H. Figuers and his wife, Emily, lived near Leesburg in a historic home
known as Noland's Ferry. Colonel Figuers was a retired officer of the United States Marine
Corps. Mrs. Figures passed away in February 2003. Mrs. Figuers was Colonel Figuers' second
wife, his first wife having predeceased him.

5.       In January 1997, Colonel Figuers executed the Horace H. Figuers Revocable
Trust (hereinafter, the "Trust"). The Trust initially named George de Garmo as Trustee, and
Michael Kelleher as successor Trustee. Pl. Ex. 1, p. 1.

6.       Mr. Roberson met Colonel Figuers by happenstance in the Town of Leesburg.
They became close, and Colonel Figuers engaged Mr. Roberson as his accountant. Over the
years they became closer, to the point where Mr. Roberson would describe his relationship with
the Colonel as "grandfatherly."

7.      On or about October 4, 2002, Colonel Figuers executed a General Durable Power of Attorney, appointing Mr. Roberson as his attorney in fact with respect to the Colonel's property, real and personal. Def. Ex. O. Mr. Roberson declined to accept a medical power of attorney, believing that personal, life-care decisions should be left to family members. The Colonel's son Robert was granted a medical power of attorney.

8.      In May 2002, Colonel Figuers executed an Appointment of Successor Trustee, naming Mr. Roberson as the Trustee of the Trust. Pl. Ex. 2.

9.      During his tenure as Trustee, Mr. Roberson maintained one bank account for the Trust, at BB&T.

10.     As Colonel Figuers' health declined, Mr. Roberson began to take on more responsibilities for care of the Colonel and his property. As more fully described below, Noland's Ferry, by all accounts, was in a state of disrepair, and Mr. Roberson was required to spend a great deal of time locating, interviewing and supervising contractors for the upkeep and repair of the property, some of whom were required to be knowledgeable in the repair of historic homes.

11.     Mr. Roberson also engaged a company by the name of Visiting Angels, in March 2003. At first, Visiting Angels provided such in-home assistance as cooking meals and light housekeeping for the Colonel. As the Colonel's health progressively worsened, in July 2005, the firm's responsibilities increased to 24 hours a day, seven days a week, companion care (though, the Visiting Angels personnel do not have medical licenses, and are not expected to provide any medical care). In May 2006, this level of care was increased to what is described as personal care. Pl. Ex. 21. Mr. Roberson served as the primary point of contact for the Visiting Angels for everything except medical decisions.

3

12.     It was the Colonel's express wish that he live at Noland's Ferry until he died. Unfortunately, this was not possible, and he had to be removed from the property. He died on July 7, 2010. He is survived by four adult children from his first marriage.

13.     Mr. Roberson served as Executor of the Colonel's estate. He has filed the necessary paperwork with the Circuit Court, and the estate has been closed.

*B.  Mr. Roberson's Resignation as Trustee and the Trust's Complaint.*

14.     After the Colonel's death, his adult children began looking into his financial affairs. On June 6, 2011, an attorney for the children made a demand on Mr. Roberson for a full and complete accounting of the assets of the Trust. Def. Ex. H. Mr. Roberson, through his attorney, provided a partial accounting on June 9, 2011. Def. Ex. I.

15.     Mr. Roberson resigned as Trustee on June 21, 2011. Pl. Ex. 4. Upon Mr. Roberson's resignation, Sands Figuers was appointed as the successor Trustee. Pl. Ex. 2; Def. Ex. M, ¶ 2.

16.     On April 1, 2013, Sands Figuers filed a Complaint against Mr. Roberson in the U.S. District Court for this District for Breach of Fiduciary Duty, and for an Accounting. Def. Ex. M.

17.     Mr. Roberson filed a Voluntary Petition under Chapter 7 with this Court on March 11, 2013. Mr. Figuers filed a Complaint to Determine the Dischargeablity of Debts under Section 523 of the Code on June 17, 2013.

*C.  Mr. Roberson's Fees as Trustee.*

18.     The Trust's first criticism of Mr. Roberson is as to his fees. The Trust's beneficiaries assert that over the 9 years during which Mr. Roberson served as Trustee, his fees exceeded $500,000. Pl. Ex. 5 ($525,485.14).

19.     The Trust provides for compensation to the Trustees "for their services as we may mutually agree." Pl. Ex. 1, Art. V, Sec. (E). Mr. Roberson charged the Trust $200 per hour for his services, and testified that he and the Colonel agreed on this amount. His testimony as to his agreement with the Colonel on his compensation is unrebutted, and the Court accepts his testimony in this regard.

20.     The nature and extent of Mr. Roberson's services are documented in a General Ledger, kept on QuickBooks Pro. Pl. Ex. 11. Mr. Roberson turned over a part of the General Ledger when his attorney responded to the beneficiaries' demand for an accounting on June 9, 2011. Def. Ex. I. The balance of the General Ledger was turned over in July 2011.

21.     Mr. Roberson's practice was to keep his time on time sheets, which were then entered by his staff into the accounting system, which in turn, would generate invoices to the clients. Mr. Roberson found his time records in the storage facility in Winchester, after they had been requested in a Request for Production of Documents in the District Court litigation. Rather than turn over the originals for copying and production, though, Mr. Roberson hand-copied the time sheets in an effort to avoid the production of information relating to clients not relevant to the litigation. Def. Ex. P. The original time records were destroyed. Although it was a close call, the Court admitted the time records pursuant to Federal Rule of Evidence 1003 (Admissibility of Duplicates), for the reasons stated on the record.[2]

22.     Mr. Roberson billed the Trust in two ways – first, he billed the Trust for "accounting services." Pl. Ex. 16. Second, he billed the Trust for work in process, i.e., work for which he held the time because there were not sufficient funds in the Trust to pay the bills, but

---

[2]  Counsel for the Plaintiff represented that he had served Mr. Bolyard with a subpoena duces tecum for any records or electronically stored information relating to the Trust, but that Mr. Bolyard responded that he did not have any responsive documents or information.

for which he would later issue "catch-up" invoices, denominated as "professional services." Pl.

Ex. 15.

23.     Mr. Roberson did not prepare annual accountings for the Trust. The Plaintiff's

expert, Mr. Murray, testified that this was not in accordance with what he viewed to be the best

practices for a fiduciary. The Trust provides:

> <u>Accountings</u>. My Trustees shall make an annual accounting (i) during my lifetime, to me
> or to the one who, in the opinion of my Trustees, is primarily in charge of my affairs, and
> (ii) after my death, to my Executor or Administrator, to the adult beneficiaries of any
> trust created hereby and to the guardians of any minor beneficiaries of any trust created
> hereby.

Pl. Ex. 1, Art. V, Sec. I.

24.     According to Mr. Roberson's testimony, it was unnecessary to prepare annual

accountings because he viewed himself to be the person primarily in charge of the Colonels'

affairs, and he would have been providing annual accountings to himself (still, the Court accepts

Mr. Murray's testimony on this point, that preparing annual accountings for record-keeping

purposes would have been the prudent thing to do).

25.     Mr. Roberson further testified that, in his view, he complied with the terms of the

Trust when he turned over the General Ledger to counsel for the beneficiaries (one of whom

became the successor Trustee).

26.     The successor Trustee, Sands Figuers, testified that Mr. Roberson told him that he

was charging only about $30,000 per year for his services as Trustee. However, this conversation

occurred after the Colonel's funeral, and the Court found that there was no breach of this

representation, at least for the remainder of the time that Mr. Roberson served as Trustee.

27.     Mr. Murray, the Plaintiff's expert, testified that, from what he could discern, he

was unable to conclude that Mr. Roberson's fees were reasonable. His testimony relied primarily

on the lack of annual accountings and the lack of contemporaneous time records against which the fees could be compared. The Court accepts this testimony as helpful expert testimony on the matter of the reasonableness of Mr. Roberson's fees under State law.

28.     Mr. Moore, of the Visiting Angels, testified that Mr. Roberson was his primary point of contact, and that he interacted with Mr. Roberson 3-4 times per week (his office happened to be across the hall in the same building in Leesburg as Mr. Roberson's office). Ms. Fletcher, who was Colonel Figuer's caregiver from the Visiting Angels, testified that Mr. Roberson acted as the Colonel's "advocate and guardian," that he was a "devoted friend," and that he was "always" involved and available should any questions arise (which they did with some frequency).

29.     Ms. Fletcher testified that when she first arrived at Noland's Ferry, the condition of the home was "deplorable." She testified that the home was infested with rodents and snakes, and was badly in need of repair in many respects. She testified that Mr. Roberson was the person responsible for hiring the contractors to perform the repairs to Noland's Ferry.

30.     Ms. Anderson worked in Mr. Roberson's office from June 1987, through 2012. She is Carla Buford's sister (the Carla Buford matter is discussed below). She started out as a bookkeeper for the firm, doing payroll and the like. She later began to prepare tax returns for the firm's clients, though, she did not prepare any tax returns for the Trust. She testified that clients were billed monthly at an hourly rate, except for bookkeeping clients who were billed at a flat monthly rate. She testified that time was entered for all of the employees from the time sheets into the billing system (known as Creative Solutions, and later, Practice Management), and that Mr. Roberson was no exception (though, at times he had to be prodded to get his time into the system). She further testified that the firm never broke down their invoices into identifiable time

entries as to date and time; rather, all the bills were general descriptions of the work done ("accounting," "tax preparation" and the like).

31.    Ms. Anderson testified that Mr. Roberson received phone calls from Noland's Ferry "quite often," though not on a daily basis. She testified that Mr. Roberson would either return the calls or he would go out to Noland's Ferry (a distance of 15 or 20 minutes from Leesburg) to handle the matter.

32.    The enormity of the task of repairing and maintaining the Noland's Ferry property (where, it must be remembered, the Colonel insisted on living out his final days) cannot be overstated. The General Ledger shows that the Trust spent a total of $517,416.94 for building repairs, including plumbing, heating, cabinetry, appliances and roofing, and $465,702.40 for landscaping and tree maintenance, for total expenses of $983,119.34, over Mr. Roberson's term as Trustee. Pl. Ex. 11.

   *D. The 23 Sycolin, LLC,  Loan.*

33.    In January 2008, Mr. Roberson, as Trustee, made a loan in the principal amount of $650,000 to 23 Sycolin, LLC. The loan was evidenced by a Note and was secured by a first priority Deed of Trust. Pl. Exs. 34 and 35. The Note called for interest only payments in the amount of $4,333.33 per month (which equates to interest at 8% per annum). Pl. Ex. 34. It had a maturity date of February 28, 2010. *Id.*

34.    At the time of the loan, 23 Sycolin's existence had been canceled as of December 31, 2007, for failure to pay annual registration fees with the Virginia State Corporation Commission. Pl. Ex. 40.

35.    Mr. Roberson testified that he was personally familiar with the 23 Sycolin, LLC, property, as it was near his office in the Town of Leesburg. He also testified that, prior to making

the loan, he was aware of a contract for the purchase of the property in the amount of $960,000, and that he had seen an appraisal of the property that was performed for Summit Community Bank by Thor Larsen & Associates. Mr. Larsen's appraisal concluded that the property had a fair market value of $930,000 ("Subject Property 'As Is' Fee Simple Interest"). Def. Exs. B and E.

36.     Donald E. Nelson was the Managing Member of 23 Sycolin, LLC, at the time of the loan. Mr. Nelson was a friend of Mr. Roberson, and worked at Mr. Roberson's accounting firm for a period of time. Mr. Nelson did not personally guarantee the loan.

37.     Matthew Everly, a commercial real estate broker who represented the prospective purchaser, testified that a Purchase Contract Addendum was signed, extending the study period under the contract to October 31, 2007. Def. Ex. C. He also identified a letter dated October 22, 2007, in which the purchaser offered to go to settlement without an occupancy permit, for the purchase price of $800,000. Def. Ex. D. The Court sustained an objection to Defendant's Exhibit D, because Mr. Roberson could not recall seeing Exhibit D before he made the loan. Mr. Roberson did testify, however, that he had seen the contract and the appraisal before he made the loan.

38.     Mr. Everly also testified that the contract was terminated before the end of 2007, because the seller, 23 Sycolin, LLC, accused the purchaser of attempting to "re-trade the deal." Mr. Everly testified that Mr. Nelson certainly would have known of the termination of the contract without a closing by the end of 2007. It is not clear whether Mr. Nelson communicated this to Mr. Roberson before Mr. Roberson made the loan to 23 Sycolin, LLC.

39.     23 Sycolin, LLC, made the monthly interest payments on the loan for fifteen months, at which point it defaulted.[3] Mr. Roberson did not initiate foreclosure proceedings, though he testified that he monitored the situation by making inquiries with Mr. Nelson, and with the real estate agent that had the listing, and by checking the Loudoun County tax assessor's records to determine whether or not the real estate taxes were being paid.

40.     After Sands Figuers took over as successor Trustee, the Trust foreclosed on the Deed of Trust. The Trust bid $194,000 for the property. Pl. Ex. 41, p. 17 (Trustee's Deed). After the expenses of the foreclosure, the net credit to the Note was in the amount of $185,909.51. *Id.,* p. 129. The amount of the debt, after taking into account the monthly interest payments made, was $859,065.57 as of the foreclosure. *Id.*, p. 144. The deficiency, therefore, stands at $673,156.06. It is highly unlikely that this deficiency amount will ever be collected from 23 Sycolin, LLC (which almost certainly was a single asset limited liability company), though there is the possibility that the Trust could recoup some of the loss by selling the property for more than its foreclosure bid of $194,000.

*E.  The Carla Buford Embezzlement.*

41.     According to Ms. Anderson, Carla Buford's sister, Ms. Buford worked for Mr. Roberson for nine or ten years. Ms. Buford acted as a bookkeeper, doing payroll and billing for the firm. Mr. Roberson testified that Ms. Buford was a trusted employee for many years at his firm.

42.     Mr. Roberson testified that when the BB&T bank statements came in the mail, he would do a "quick review," to compare the ending balance to the cash balance on the General

---

[3]  Plaintiff's Ex. 41 (p. 144) indicates that 23 Sycolin, LLC, paid $64,999.95 in payments. This number divided by the interest-only monthly amount of $4,333.33, yields 15 months.

Ledger. He then handed the bank statements off to Ms. Buford to do a detailed reconciliation.

Mr. Roberson did not personally reconcile the bank statements; rather, he looked at the

statements "as to reasonableness," and "as to the balance." He acknowledged that he never

personally balanced the checkbook.

43.     From the period August 21, 2006, through July 7, 2010, Ms. Buford wrote 52

checks totaling $193,755.31. Pl. Ex. 32. Although all of the checks are payable to Ms. Buford

(*Id.*), the checks are entered in the General Ledger as payments to Mr. Roberson for accounting

fees. *See, e.g.,* Ex. 11, Check No. 8643 ($2,000), purporting to be payable to George Roberson

for Accounting; Check No. 8666 ($2,000) (same); Check No. 8669 ($2,300) (same).

44.     Mr. Roberson acknowledges that Ms. Buford was never owed any money by the

Trust. In short, Ms. Buford embezzled this money from the Trust.

45.     Mr. Roberson also acknowledges that he signed five of the checks payable to Ms.

Buford, though he could not remember the purpose of the checks.

46.     Mr. Roberson did not learn of the embezzlement until he was preparing for his

deposition in the District Court case. He testified that he was shocked by this. He put his

insurance company on notice, but he has not received any payment on the claim.

47.     Sands Figuers as successor Trustee brought a suit against Ms. Buford in the

Circuit Court of Loudoun County, alleging conversion, fraud and unjust enrichment. Def. Ex. L.

The Complaint alleges: "Upon information and belief, defendant Buford concealed her activities

from the then-trustee so that she could continue her fraudulent and illegal scheme." *Id.*, ¶ 19. The

lawsuit has not been resolved. Mr. Figuers has spoken with a Loudoun County detective but, so

far, Mr. Figuers has not pressed the matter (though, he indicates that he may well do so).

*F.  The $17,000 Loan to Anne Decourcy.*

48.      On July 14, 2006, Mr. Roberson made a loan of $17,000 to Anne Decourcy. Pl.

Ex. 33. Ms. Decourcy was a client of Mr. Roberson's, and was the daughter of a client. There

was no promissory note. The loan was intended to be a short term, unsecured loan, to be used to

fix up Ms. Decourcy's property in Garrett County (Deep Creek Lake), Maryland, in anticipation

of her selling the property. The interest rate was 6% (though this wasn't written down

anywhere).

49.      Mr. Roberson did not obtain or review Ms. Decourcy's personal financial

statement before he made the loan. He did not obtain or review an appraisal of the Deep Creek

Lake property (because the loan was an unsecured loan), though he testified that he was of the

understanding that the property was worth more than $1,000,000. He did not have an

understanding of the amount of any liens against the property.

50.      Ms. Decourcy made one loan payment, in the amount of $1,572.88. Pl. Ex. 11

(General Ledger), p. 124. She has made no further payments on the loan.

51.      Mr. Roberson did not make any written demand for payment to Ms. Decourcy,

though he says that he verbally demanded payment from her. He did not bring a lawsuit against

her, while he was Trustee.

*G.  The $15,000 Cashier's Check to Charles A. Wakefield.*

52.      On February 8, 2008, Mr. Roberson purchased a Cashier's Check in the amount

of $15,000, payable to Charles Wakefield, P.C. Pl. Ex. 11, p. 31; Pl. Ex. 30.[4] Mr. Roberson

testified that Mr. Wakefield needed the funds in a hurry (for unspecified reasons), which is why

---

[4]  The entry for February 8, 2008, in the General Ledger is for $15,008. Mr. Roberson testified that the bank charged
him $8 for the Cashier's Check.

Mr. Roberson purchased a Cashier's Check, instead of writing a check to himself for fees, waiting for that check to clear, and then delivering a personal check to Mr. Wakefield.

53.     The payment to Mr. Wakefield was made on a personal obligation of Mr. Roberson, not an obligation of the Trust. Mr. Roberson testified that he obtained the money from the Trust for payment on his work in process (i.e., for work that had been performed but not previously billed). When asked by the Court whether there was an invoice for work in process that matched this amount, Mr. Roberson testified that he didn't know.

54.     There is no invoice in Plaintiff's Exhibit 15, the work in process invoices that match the date and amount of this disbursement. There is an invoice for $23,000 dated January 31, 2008, and there is an invoice for $5,000 dated March 31, 2008. Pl. Ex. 15, pp. 6 and 7. There is no work in process invoice for February 2008, and there is no invoice for $15,000 that is roughly contemporaneous with the date of the payment.

*H.  The Sale of the Bethesda Property and the $50,000 Trustee Fee.*

55.     Colonel Figuers owned a parcel of real property located in Bethesda (Montgomery County), Maryland, on Burdette Road. Def. Ex. F (Deed). The property was titled in the Colonel's name, he having acquired it from his second wife's, Emily's, Revocable Trust. *Id.*

56.     Although the property was not titled in the name of the Trust, Mr. Roberson testified that he did not consider the property to be owned by Colonel Figuers individually, stating: "I didn't distinguish between his personal assets and Trust assets."

57.     On September 11, 2007, Mr. Roberson sold this property for the Colonel. Def. Ex. G (HUD-1 Settlement Statement); Pl. Ex. 27 (same). He realized $1,037,121.95 in net proceeds,

13

which he deposited into the BB&T account, and which are reflected as a deposit on the General

Ledger for the Trust. *Id.*; Pl. Ex. 11, p. 27.

58.     Prior to the sale, Mr. Roberson billed the Trust twice  for his services related to

the sale of the Property, at his hourly rate. Pl. Ex. 28, 29. These invoices are dated June 19, 2007,

and July 10, 2007, in the amounts of $4,545 and $4,321.25, respectively. These amounts were

paid out of the BB&T account (from Trust proceeds) on June 22, 2007 ($4,545), on July 13,

2007 ($2,000), and July 18, 2007 ($2,321.25). Pl. Ex. 11, p. 26.[5]

59.     Mr. Roberson wrote a check to himself in the amount of $50,000 from the BB&T

account. Pl. Ex. 26. The legend on the check (Check No. 8928) states: "Trustee Fee." *Id*. The

$50,000 payment is reflected in the General Ledger of the Trust as a "General Journal" entry. Pl.

Ex. 25. Mr. Roberson testified that he used a General Journal entry because he did not consider

the $50,000 to be an expense of the Trust, considering it to be the Colonel's personal expense.

60.     Mr. Roberson relied on the General Durable Power of Attorney to execute the

documents in connection with this transaction. Def. Ex. O. The General Durable Power of

Attorney provides in part: "I hereby direct that George A. Roberson shall be entitled to and shall

be paid a fee for his services rendered hereunder at his regular hourly rate for services rendered

in his professional capacity as a Certified Public Accountant at the time such services are

rendered."

61.     Prior to taking the $50,000 fee Mr. Roberson consulted with an attorney, Greg

Harris, who is admitted to practice in both Maryland and Virginia. Mr. Harris testified that he

advised Mr. Roberson that a trustee's fee of 5% would be reasonable, based on his experience.

---

[5]  Mr. Roberson also billed fees for Don Nelson (presumably the same Don Nelson who was one of the principals in
23 Sycolin, LLC), in the amount of $5,320.20, for Mr. Nelson's services in connection with the sale of the Bethesda
property to the Trust. Pl. Ex. 38.

14

Mr. Harris did not testify as to whether Mr. Roberson advised him that the General Durable Power of Attorney limited Mr. Roberson's fee to an hourly rate, as opposed to a percentage commission.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the District Court for this District dated August 15, 1984. This is a core proceeding under 28 U.S.C. 157(b)(2)(I) (determinations as to the dischargeability of particular debts). The Plaintiff bears the burden of proof on all of the elements of non-dischargeability under Section 523, by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493, 497 (4th Cir. 2008).[6]

This is a case to determine the dischargeability of certain debts under Section 523(a)(4) of the Bankruptcy Code (11 U.S.C. § 523(a)(4)). The case of *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754 (2013), changed the law in the Fourth Circuit, with respect to the proof needed to sustain a claim under Section 523(a)(4). Previously, "negligence or even an innocent mistake which results in the failure to account" was sufficient to prove a case under Section 523(a)(4). *See In re Strack*, 524 F.3d at 497; *Republic of Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir. 2001). *Bullock* raised the standard to that of intentional misconduct, or at least reckless disregard of a known duty. The Supreme Court held with respect to the term "defalcation:"

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind

---

[6]  As more fully discussed below, *Strack's* holding, that "'negligence or even an innocent mistake which results in… [the] failure to account is sufficient'" under Section 523(a)(4), *In re Strack*, 524 F.3d 493, 498 n. 7 (4th Cir. 2008) (quoting *Republic of Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir. 2001)), is no longer good law in light of the Supreme Court's recent opinion in *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754 (2013).

that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id*., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

*Bullock*, 133 S.Ct. at 1759-60.

It is with *Bullock* in mind that the Court evaluates each of the Plaintiff's claims for non-

dischargeability.

## I.   The Claim of Excessive Fees.

The Trust provides with respect to compensation of the Trustee:

Compensation. During my lifetime my Trustees shall receive such compensation for their services as we may mutually agree. Upon my death, my Trustee shall receive as compensation for his services the amount specified for such services in the published fee schedule of his firm in effect at the time such services are rendered.

Pl. Ex. 1, Art. V, Sec. (E).

There is no question in this case that Mr. Roberson and Colonel Figuers agreed from the

outset that Mr. Roberson would be compensated at his hourly rate of $200 for his services as

Trustee.

Ordinarily, the terms of the trust will set the amount of the trustee's compensation.

Restatement of Trusts (First), § 242, Comment (f). If the trustee agrees with the settlor on an

amount of compensation, the trustee is entitled only to that compensation. *Id*., Comment (h). The

exception is where the fiduciary has not faithfully performed his or her duties, causing a loss of

trust assets. *Id*., § 243 ("If the trustee commits a breach of trust, the court may in its discretion

16

deny him all compensation or allow him a reduced compensation or allow him full

compensation.") *See also Id.,* Comment (a) ("If the trustee commits a breach of trust, he is liable

to the beneficiary for any loss thereby occasioned"), and Comment (b) ("Where the trustee

commits a breach of trust which causes a loss to the trust estate, even though the trustee may be

entitled to compensation, his claim for compensation can be set off against his liability for the

loss, and he is not entitled to full compensation without making good the loss.") Where there has

been partial performance, partial compensation may be permitted. *Clare v. Grasty*, 213 Va. 165,

170, 191 S.E.2d 184, 188 (1972); *Cannon v. Searles*, 150 Va. 738, 750, 143 S.E. 495, 499

(1928).

This Court is mindful, however, that it does not sit as a chancellor in State court to

approve or disapprove of Mr. Roberson's fees as a Trustee, in whole or in part. Rather, the Court

must decide the issue of dischargeability as a matter of federal law, in this case, Section

523(a)(4) of the Bankruptcy Code, with the standard enunciated in *Bullock* as its guide. The

Court finds that the Plaintiff's claim with respect to excessive fees fails to meet the standard of

willfulness, or gross recklessness in the face of a known duty, under *Bullock*.

First, as noted above, it cannot be denied that Mr. Roberson spent an enormous amount of

time in attending to Colonel Figuers' needs and, in particular, dealing with the extensive repairs

and maintenance requirements of Noland's Ferry. The Plaintiff asserts that Mr. Roberson

charged his hourly rate for social visits with the Colonel, but there was no evidence presented

that any of Mr. Roberson's visits to Noland's Ferry were for anything other than administration

of the Trust. The Plaintiff also asserts that Mr. Roberson could have engaged a construction

manager to supervise all of the contractors who worked on Noland's Ferry. There was no

evidence presented, though, that the engagement of a construction manager would have saved

the Trust substantial sums of money, relative to Mr. Roberson's fees. Further, had Mr. Roberson

engaged a construction manager, he still would have had the responsibility for inspecting the

work, approving what was done, reviewing invoices and writing checks to the contractors.

The Plaintiff, Sands Figures, testified that Mr. Roberson represented to him that his

Trustee fees were on the order of $30,000 per year. This statement was made after the Colonel's

death, and the Court found in connection with the Rule 52(c) motion at trial that, in fact, Mr.

Roberson's fees for the twelve months preceding his resignation as Trustee did not exceed

$30,000 on an annualized basis.

In the end, the Court is unable to find that Mr. Roberson's fees were so excessive or

unreasonable that they would come within the *Bullock* standard for non-dischargeability. This

claim will be dismissed.

## II.     The Sycolin Road Loan.

The Trust granted the Trustee the power to "retain and to invest in all forms of real and

personal property, without being confined to investments authorized by a statutory list, without

being required to diversify and regardless of any principle of law limiting delegation of

investment responsibility by executors or trustees." Pl. Ex. 1, Art. V, Sec. (F). The Plaintiff

asserts that the making of the loan to 23 Sycolin, LLC, was an act of recklessness. It is true that

23 Sycolin, LLC, had been terminated by the Virginia State Corporation Commission in

December 2007, just before the loan was made in January 2008. Pl. Ex. 40. There is no evidence,

however, that the termination of 23 Sycolin by the State Corporation Commission impaired the

lien represented by the Deed of Trust for this loan in any way, and indeed, the successor Trustee

proceeded to foreclose on the property without incident, and without the need to seek the aid and

guidance of the Circuit Court.

The Plaintiff also asserts that the loan depleted the Trust almost entirely, but this tells only a part of the story. It is true that the loan left the Trust with little cash for the Colonel's day to day needs, but when one considers the assets of the Trust as a whole (including a one-half interest in Noland's Ferry), the Court is unable to conclude that making the loan was a reckless act relative to the remaining assets of the Trust.

The Plaintiff argues that the loan was to Mr. Nelson's limited liability company, and that Mr. Nelson was a friend of Mr. Roberson. Further, Mr. Roberson did not obtain a personal guaranty from Mr. Nelson. It is true that most commercial lending institutions probably would not have made the loan without a personal guaranty from Mr. Nelson, but this does not mean that Mr. Roberson knowingly or recklessly violated his fiduciary duties in making the loan. Mr. Roberson had seen an appraisal of the property by a reputable, licensed real estate appraiser, which concluded that the property had a value "As Is" in the amount of $930,000. The loan to value ratio was 70% (assuming a $930,000 value).

The Restatement (Second) of Trusts, § 229, and its accompanying Comment (a), provide as follows:

> Except as otherwise provided by the terms of the trust, the trustee cannot properly lend on a mortgage upon real property more than a reasonable proportion of the value of the mortgaged property.

> Comment:

> a. Amount which may properly be lent. In many States statutes provide what proportion of the value of real property may be lent by trustees on mortgage. In the absence of a statute the amount depends upon the circumstances. Among the circumstances which are material are the character of the land, whether improved or unimproved, whether urban or rural, its marketability, whether its value is fluctuating or stable, the trend of values of real property in the locality, the probable income from the property.

> If the property is speculative in character or its value fluctuates greatly it may be improper to lend on a mortgage upon it.

19

> In general a trustee cannot properly lend on a mortgage upon real property more than from one-half to two-thirds of the value of the mortgaged property.

The Court is not sure of the origins of the "one half to two thirds of the value" standard stated in Comment (a). However, the loan here, as noted, had a 70% loan to value ratio. Using the upper range suggested by the Second Restatement of 66 and 2/3%, the Court is unable to find that the additional 3 and 1/3% in loan to value constituted a willful disregard of Mr. Roberson's duties as Trustee in this case.

It may have been imprudent not to require a personal guaranty from 23 Sycolin's principals at the time of the loan, but this alleged failure does not rise to the level of knowing or reckless disregard of Mr. Roberson's fiduciary duties to the Trust. The Court finds that, under *Bullock*, the Plaintiff's evidence does not establish the non-dischargeability of the deficiency amount on the 23 Sycolin loan.

### III.    The Carla Buford Embezzlement.

The Carla Buford embezzlement is another matter altogether. As more fully set forth below, the Court finds that Mr. Roberson's actions were more than just negligent. The Plaintiff's evidence here meets the more exacting standard under *Bullock*.

A trustee is under a duty to exercise supervision over agents to whom he or she has delegated responsibilities on behalf of the trust. Restatement (Second), § 171, Comment (k). More specifically, Restatement (Second), Section 225(2) provides in relevant part:

> The trustee is liable to the beneficiary for an act of such an agent which if done by the trustee would constitute a breach of trust, if the trustee
>
> (a) directs or permits the act of the agent; or
>
> (b) delegates to the agent the performance of acts which he was under a duty not to delegate; or
>
> (c) does not use reasonable care in the selection or retention of the agent; or

20

(d) does not exercise proper supervision over the conduct of the agent; or

(e) approves or acquiesces in or conceals the act of the agent; or

(f) neglects to take proper steps to compel the agent to redress the wrong.

Mr. Roberson's responsibility to reconcile the bank statements was not a delegable duty.

*In re Carter*, 887 A.2d 1, 13 (D.C. Ct. App. 2005) (attorney has non-delegable duty to review

bank statements for her trust account); *Attorney Grievance Comm. v. Zuckerman,* 386 Md. 341,

373-74, 872 A.2d 693, 712-13 (2005).[7]  It is clear that Mr. Roberson improperly delegated the

responsibility of reviewing and reconciling the bank statements to Ms. Buford, and that he failed

to exercise proper supervision over Ms. Buford.

Further the Court finds that Mr. Roberson's actions here were in conscious disregard of a

known duty, under *Bullock.* This was not a one-time event where the trustee is caught unawares

by the dishonesty of someone in his office. Rather, this fraud was perpetrated over a period of

four years. A total of 52 checks were issued to Ms. Buford. Ms. Buford was the payee on all of

the checks. Mr. Roberson, on the other hand, was listed as the payee in the General Ledger, for

accounting services. Ms. Buford had unfettered access to the checkbook during this entire period

of time. Mr. Roberson had actual knowledge that Ms. Buford was not a creditor of the Trust.

During this entire four year period, Mr. Roberson never once attempted to reconcile the BB&T

bank statements. Mr. Roberson even signed five of the checks, though he had no idea what they

were for. Further, he certainly should have known, by looking at the General Ledger alone, that

he himself was not receiving the payments described in the General Ledger. All sorts of red flags

---

[7]  The Court realizes that these cases involved attorneys and their trust accounts (though the attorney in *Carter* was
acting as a fiduciary for an estate). However, the Court finds these cases persuasive because the attorneys were
acting as fiduciaries with respect to the funds entrusted to them. Mr. Roberson was not acting as an attorney, and  is
not subject to the Rules of Professional Conduct for attorneys, but he was acting as a fiduciary at all times.

were raised, but Mr. Roberson never even looked at the BB&T statements, other than a cursory

review as to the aggregate balance as against the General Ledger (and, they did in fact balance

because the embezzled funds were listed in the General Ledger as payments to Mr. Roberson

himself).

The Court finds that Mr. Roberson's failure to review the BB&T bank statements and to

reconcile those statements for over four years constituted a conscious disregard of his known

duties as a fiduciary within the meaning of *Bullock.* The debt arising from the Carla Buford

embezzlement will be held to be non-dischargeable under Section 523(a)(4).

### IV.    The $17,000 Loan to Anne Decoury.

Ann Decourcy was a client of Mr. Roberson's, as was her father. In July 2006, Mr.

Roberson loaned Ms. Decoursy $17,000. The loan was an unsecured loan, not evidenced by a

promissory note. It was intended to be a short term loan, for the purpose of allowing Ms.

Decourcy to make certain repairs to her property in Deep Creek Lake, Maryland. The loan has

never been repaid.

While Mr. Roberson's actions here could be described as a breach of his fiduciary duties

under State law, the Court finds that his actions do not rise to the level of willfulness or a

reckless disregard of a known duty under *Bullock*. The Court will declare the Debtor's liability

for the Decoursy loan to be dischargeable.

### V.    The $15,000 Cashier's Check to Charles A. Wakefield.

In February 2008, Mr. Roberson obtained a $15,000 Cashier's Check, with Trust funds.

The Cashier's Check, payable to Charles A. Wakefield, was for Mr. Roberson's personal

obligation, not an obligation of the Trust. Although Mr. Roberson testified that he was owed fees

at the time, there are two flaws with this explanation. First, there is no invoice for work in

process that matches this payment, as to amount or date. See Pl. Ex. 15. Second, Mr. Roberson

was unable to produce any kind of a running account for his fees, with debits and credits, in

order to support his theory that he was owed $15,000 in Trustee fees at the time.

In a word, Mr. Roberson misappropriated Trust funds to pay his own, personal debt. This

was knowing and unjustifiable. Even under the more exacting standard of *Bullock*, a fiduciary's

invasion of trust assets for personal purposes is a willful and knowing act. It cannot be anything

other than willful and knowing. The Court finds that the $15,000 debt is non-dischargeable under

Section 523(a)(4).

### VI.    The Sale of the Bethesda Property and the $50,000 Trustee Fee.

Finally, the Court will address the matter of the $50,000 trustee fee for the sale of the

Bethesda property. Mr. Roberson first argues that the Plaintiff lacks standing with respect to this

claim, because the property was titled in the name of Colonel Figuers, and was never titled in the

Trust. Def. Ex. F. Mr. Roberson argues that the Colonel's estate, if anyone, has standing to

maintain this claim, as opposed to the Trust.

At the same time, Mr. Roberson testified that he did not make any distinction between

Colonel Figuers' personal property and property of the Trust. The net proceeds of the sale, in the

amount of $1,037,121.95, were deposited into the BB&T account, and are accounted for as a

deposit in the General Ledger, without objection from Colonel Figuers or any member of his

family. Pl. Ex. 11, p. 27. The check for the fee (written by Mr. Roberson) states that it was for a

"Trustee's fee." Pl. Ex. 26. Mr. Roberson billed the Trust, and was paid from the Trust, for his

services based on an hourly fee, twice before the property was sold. Pl. Ex. 28, 29; Pl. Ex. 11, p.

26. Mr. Roberson billed the Trust for Don Nelson's services in connection with the sale of the

property. Pl. Ex. 38. Based on the uncontradicted evidence, the Court concludes that it was the

Colonel's intent to contribute the proceeds of the sale to the Trust and to treat the proceeds as

Trust property. *See* Restatement (Second) §§ 24 (Mode of Manifestation of Intention) and 331

(Modification of Trust by Settlor), Comment (f) (intent may be shown by conduct such as

transfer of property to another in trust).

      The Power of Attorney under which the property was sold provides for an hourly fee to

the Trustee. Pl. Ex. O. Colonel Figuers agreed to an hourly rate of $200 for the administration of

the Trust, according to Mr. Roberson's testimony. Mr. Roberson testified that he consulted with

Mr. Harris, an attorney admitted in Maryland and Virginia, and that Mr. Harris advised him that

a 5% trustee's fee would be considered reasonable by the courts in Virginia. Mr. Harris

confirmed this advice, in his testimony. Yet, there was no indication, either in Mr. Roberson's

testimony or in Mr. Harris's, that Mr. Roberson ever disclosed to Mr. Harris that the Power of

Attorney limited his fees to an hourly rate, nor that Mr. Roberson's agreement with Colonel

Figuers limited his fees to $200 per hour. The Court finds it unlikely that Mr. Harris would have

advised Mr. Roberson to take a 5% fee, notwithstanding the terms of the Power of Attorney and

the agreement regarding the Trust with Colonel Figuers. In short, Mr. Roberson was not entitled

to a fee of $50,000 (just shy of 5%) on the sale of the Bethesda property.

      Turning to the *Bullock* standard, the Court finds that Mr. Roberson's actions in taking this

fee were knowing and intentional. He can hardly claim not to have known of the terms of the

Power of Attorney. He repeatedly testified that he had agreed with Colonel Figuers to an hourly

rate of $200. The Court concludes that Mr. Roberson's taking of a 5% commission on the sale of

the Bethesda property was a knowing and willful violation of his fiduciary duties as a Trustee of

the Trust. This amount will be declared to be non-dischargeable.

**Conclusion**

For the foregoing reasons, the Court concludes as follows:

1.      The Plaintiff's claim that Mr. Roberson's fees as Trustee of the Trust were

excessive is dischargeable.

2.      The Plaintiff's claim arising from the deficiency amount on the 23 Sycolin, LLC,

loan is dischargeable.

3.      The Plaintiff's claim arising from the Carla Buford embezzlement is non-

dischargeable pursuant to 11 U.S.C. § 523(a)(4).

4.      The Plaintiff's claim for the $17,000 loan to Ann Decourcy is dischargeable.

5.      The Plaintiff's claim for the $15,000 Cashier's Check payable to Charles A.

Wakefield is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

6.      The Plaintiff's claim for the $50,000 Trustee's Fee arising out of the sale of the

Bethesda property is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

7.      The Clerk will mail copies of this Memorandum Opinion and the accompanying

Order to parties below, or will provide cm-ecf notice of their entry.

A separate Order shall issue.


Date: May 7 2014

/s/ Brian F. Kenney
_____
Brian F. Kenney
United States Bankruptcy Judge


eod 5/8/2014 sas

Copies to:

Michael Anthony Howes, Esquire
Jeremy Brian Root, Esquire
Blankingship & Keith, P.C.
4020 University Drive
Fairfax, VA 22030
Counsel for the Plaintiff

Karl W. Pilger, Esquire
Boring & Pilger, P.C.
307 Maple Ave West, Ste. D
Vienna, VA 22180-4307
Counsel for the Plaintiff

Ann E. Schmitt, Esquire
Culbert & Schmitt, PLLC
30C Catoctin Circle SE
Leesburg, VA 20175
Counsel for the Defendant

Alan B. Croft, Esquire
Laura Golden Liff, Esquire
McCandlish & Lillard
201 Loudoun Street SE, Suite 201
Leesburg, VA 20175
Counsel for the Defendant